**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------X

JUSTIN BAKER-RHETT, individually
and on behalf of all others similarly situated,

               Plaintiff,

       v.

ASPIRO AB, a Swedish limited liability
company, and KANYE WEST, an individual,
together d/b/a TIDAL,

              Defendants.

---------------------------------------------------------X

      16-cv-05801-GHW

      **PLAINTIFF BAKER-RHETT'S**
      **SECOND AMENDED CLASS**
      **ACTION COMPLAINT**

      **DEMAND FOR JURY TRIAL**

      Plaintiff Justin Baker-Rhett brings this Class Action Complaint and Demand for Jury Trial against Defendants Aspiro AB ("Aspiro") and Kanye West (collectively "Defendants"), based upon their conduct of fraudulently inducing consumers to subscribe to Tidal—a subscription-based music streaming service owned by Defendants. Plaintiff Baker-Rhett alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys:

<u>**NATURE OF THE ACTION**</u>

      1.      Tidal is a music streaming service that music mogul Shawn "Jay Z" Carter purchased in 2015 and subsequently thrust into the public dialogue.

      2.      Though Jay-Z's star-studded 2015 "re-launch" garnered Tidal significant media attention,[1] dedicated subscribers did not follow.

      3.      By early 2016, Tidal was quietly teetering on the brink of collapse. Many industry experts predicted its imminent demise absent a significant swell in users and a new round of publicity.

---

[1]    *See* Todd Spangler, *Jay Z Launches Tidal Streaming-Music Service at Star-Studded Event* (March 30, 2015), http://variety.com/2015/digital/news/jay-z-launches-tidal-streaming-music-service-1201462769/ (last visited Oct. 7, 2016).

4.      Fortunately for Tidal, help arrived just in the nick of time. International hip-hop superstar Kanye West, who owns a portion of Tidal, promised to release his long anticipated new album "*The Life of Pablo*" exclusively on Tidal. Specifically, Mr. West promised on Twitter that the "album w[ould] never never never be on Apple. And it will never be for sale… You can only get it on Tidal."[2]

5.      Mr. West's unequivocal declaration of Tidal's exclusive access to his album had a profound impact on Tidal's business. New subscriptions to the streaming platform skyrocketed, tripling its consumer base from 1 million to 3 million subscribers in just over a month.[3] According to Tidal, *The Life of Pablo* was streamed 250 million times in the first 10 days. Each new subscriber that signed up, including those who signed up for a "free" (*i.e.*, negative option) trial, submitted a credit card to be charged once the trial ended.

6.      Mr. West's promise of exclusivity also had a grave impact on consumer privacy. For each new Tidal subscriber who signed up as a result of Mr. West's claims, Tidal obtained that consumer's email address, social media account information, and other personally identifiable information. Alarmingly, Tidal specifically targeted the "personal information" of minors as young as 13 years old.

7.      Mr. West's promise of exclusive access to *The Life of Pablo* conferred an enormous benefit upon Tidal: a *tripled* subscriber base, replete with access to the personal and financial data of its more than two million new subscribers.

8.      Contrary to Mr. West's representations, however, the purportedly "exclusive" access to *The Life of Pablo* that Tidal subscribers were promised was short lived. A month and a half after *The Life of Pablo's* initial release, Mr. West made the album available through Tidal's

---

[2]      *See* Danette Chavez, *Reports of The Life of Pablo's Tidal exclusivity have been greatly exaggerated*, A.V. Club (Apr. 1, 2016), http://www.avclub.com/article/reports-life-pablos-tidal-exclusivity-have-been-gr-234694 (last visited Oct. 7, 2016).

[3]      *See* Charlotte Hassan, *Kanye May Have Single-Handedly Doubled Tidal's Subscribers…*, Digital Music News (Feb. 24, 2016), http://www.digitalmusicnews.com/2016/02/24/tidal-subscriber-numbers-surge-after-exclusively-releasing-kanyes-album/ (last visited Oct. 7, 2016).

biggest competitors, Apple Music and Spotify. He also began selling the album through his own online marketplace.

9.      By the time Mr. West changed course and broadly released *The Life of Pablo*, the deceptive marketing ploy had served its purpose: Tidal's subscriber numbers had tripled, streaming numbers were through the roof, and Tidal had collected the personal information, credit card numbers, and social media information of millions of deceived consumers. As a result, Tidal's valuation—the lifeblood of any new startup—soared.

10.     Using publically available acquisitions as a comparable metric, the two million new users acquired as a result of its purportedly exclusive access to *The Life of Pablo* are worth as much as $84 million to Tidal.[4]

11.     Unfortunately for millions of American consumers, Tidal's windfall came at a great cost. Consumers were uniformly tricked into handing over their private data and credit card information by a singular mistruth.

12.     In reality, neither Mr. West nor Aspiro ever intended *The Life of Pablo* to run exclusively on the Tidal platform. To the contrary, they—knowing that Tidal was in trouble but not wanting to invest their own money to save the company—chose to fraudulently induce millions of American consumers into paying for Tidal's rescue.[5]

13.     To obtain redress from these deceptive marketing practices, Plaintiff Baker-Rhett, on behalf of himself and a putative Class, brings this lawsuit seeking damages, disgorgement of Defendants' profits, and restitution. Additionally, Plaintiff seeks an order requiring Tidal to delete the private information of Plaintiff and the Class members that it collected, cancel all

---

[4]     *See infra*, ¶ 42.

[5]     Mr. West has boasted of his choice to use consumers' money—instead of his own—to advance his business interests, stating: "Yes I am personally rich and I can buy furs and houses for my family…but I need access to more money in order to bring more beautiful ideas to the world…If I spent my money on my ideas I could not afford to take care of my family. I am in a place that so many artist end up…**Also for anyone that has money they know the first rule is to use other people's money**." *See Kanye West Explains He's "Personally Rich" But Needs "Other People's Money" for Business Projects* (Feb. 15, 2016) (emphasis added), http://www.eonline.com/news/740077/kanye-west-explains-he-s-personally-rich-but-needs-other-people-s-money-for-business-projects (last visited Oct. 7, 2016).

outstanding negative options of any free trials created during the class period, and cease any monetization efforts relying on the illegally obtained information.

## PARTIES

14.    Plaintiff Justin Baker-Rhett is a natural person and citizen of the State of California.

15.    Defendant Aspiro AB is a Swedish limited liability company with its principal place of business located at Stora Varvsgatan 6 A, SE-211 19 Malmö, Sweden. Aspiro AB conducts business throughout this District, the State of New York, and the United States.

16.    Defendant Kanye West is a natural person and citizen of the State of California.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because (i) at least one member of the putative Class is a citizen of a state different from Defendants, (ii) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) none of the exceptions under the subsection apply to this action.

18.    This Court has personal jurisdiction over Defendants because they transact significant business in this District, including soliciting consumer business and entering into consumer and business contracts in this District, and the unlawful conduct alleged in the Complaint occurred in and emanated from this District.

19.    Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants transact significant business in this District, a substantial part of the events giving rise to the Complaint occurred in and emanated from this District, and the Parties have contractually agreed that this forum is proper for resolution of this dispute.

## FACTUAL BACKGROUND

### The Tidal Music Service

20.    Tidal was originally launched in 2014 as a high fidelity music-streaming platform by a company named Aspiro.

21.    Soon thereafter, Project Panther BidCo Ltd., a holding company controlled by

parent company Sean Carter Enterprises ("SCE") and Jay Z, acquired Defendant Aspiro AB.[6]

22.     After acquiring Aspiro, Jay Z wasted no time announcing his plans for Tidal to the world. Within a month of acquiring the company, Jay Z announced that Tidal would "be the streaming home for artists like himself, Beyonce, Rihanna, Kanye West, Jack White, Arcade Fire, Usher, Nicki Minaj, Coldplay, Alicia Keys, Calvin Harris, Daft Punk, deadmau5, Jason Aldean, J. Cole, and Madonna."[7] Tidal was also touted as the first "artist owned" streaming service. Its initial stakeholders included world-renowned artists Alicia Keys, Win Butler, Regine Chassagne, Beyonce, Calvin Harris, Chris Martin, Daft Punk, deadmau5, Jack White, Jason Aldean, J. Cole, Madonna, Nicki Minaj, Rihanna, Usher, Jay Z himself, and Defendant Mr. West.[8]

23.     Each owner/artist was offered a three percent stake in the company in exchange for creating Tidal exclusive content to drive consumers to the subscription only streaming platform.[9]

24.     The founding stakeholders also committed their social media presence to promoting Tidal. Jay Z and other stakeholders, including Mr. West, leveraged their Twitter accounts to spread word of Tidal's re-launch to their massive Twitter followings.[10] (Kanye West has over 26 million Twitter followers alone.[11]) Tidal itself, along with its dozens of owner-

---

[6]     *See Project Panther Bidco Ltd launches a recommended cash offer of SEK 1.05 per share to the shareholders of Aspiro AB*, http://www.aspiro.com/wp/wp-content/uploads/2015/01/Offer-press-release-Panther-protected.pdf (last visited Oct. 7, 2016).

[7]     *See* Andrew Flanagan, *It's Official: Jay Z's Historic Tidal Launches With 16 Artists Stakeholders*, billboard (Mar. 30, 2015), http://www.billboard.com/articles/news/6509498/jay-z-tidal-launch-artist-stakeholders (last visited Oct. 7, 2016).

[8]     *See Who Owns TIDAL*, TIDAL, https://support.tidal.com/hc/en-us/articles/203055651-Who-Owns-TIDAL- (last visited Oct. 7, 2016).

[9]     *See* Andrew Flanagan and Andrew Hampp, *It's Official: Jay Z's Historic Tidal Launches With 16 Artists Stakeholders*, billboard (Mar/ 30, 2015) http://www.billboard.com/articles/news /6509498/jay-z-tidal-launch-artist-stakeholders (last visited Oct. 7, 2016).

[10]    *See* James Grebey, *Jay Z's New Tidal Streaming Service Has Turned Everybody's Avatar Blue*, SPIN (Mar. 30, 2015), http://www.spin.com/2015/03/jay-z-tidal-streaming-launch-blue-twitter-kanye-west-arcade-fire-third-man/ (last visited Oct. 7, 2016).

[11]    *See Kanye West*, Twitter https://twitter.com/kanyewest (last visited Oct. 7, 2016) (identifying more than 26.2 million followers of Mr. West on Twitter).

artists, have used Twitter as a mass-marketing medium for expanding their subscriber base.





<u>Figure 1</u>.

25.     Despite debuting to excessive fanfare, Tidal soon fizzled as a streaming service. Its inability to generate revenue led many in the music industry to believe the media platform faced almost imminent doom. In fact, a survey of fifty music executives conducted by Billboard "revealed that 71 percent of respondents th[ought] Tidal w[ould] be gone in a year or less[.]"[12] Circumstances were so dire that Tidal admitted in early 2015 that the company was not fully funded to last through the next twelve months.[13] It also conceded that the service would "have to achieve an extreme and unprecedented growth in number of subscribers simply to survive[.]"[14]

26.     It was during this dire period that world-renowned rap artist, entrepreneur, and

---

[12]     *See* Max Willens, *Is Tidal Failing? Music Industry Executives Put Jay Z's Embattled Streaming Service on Deathwatch*, IBT (Aug. 27, 2015), http://www.ibtimes.com/tidal-failing-music-industry-executives-put-jay-zs-embattled-streaming-service-2071365 (last visited Oct. 7, 2016).

[13]     *See* Max Willens, *Is Jay-Z A Bad Businessman? WiMP, Tidal, Struggling Streaming Music Services Raise Questions*, IBT (Feb. 18, 2015), http://www.ibtimes.com/jay-z-bad-businessman-wimp-tidal-struggling-streaming-music-services-raise-questions-1820460 (last visited Oct. 7, 2016).

[14]     *Id*. (internal quotes omitted).

polymath, Kanye West, announced that his upcoming album, *The Life of Pablo*, would be available exclusively on Tidal.[15]

**Exclusive Release of *The Life of Pablo***

27.     Defendant West is known the world over for his artistic contributions and innovations to the rap genre. Mr. West is a musical paragon, with twenty-one Grammy awards, three albums included on the 2012 *Rolling Stone* "500 Greatest Albums of All Time" list, and the honor of having been selected as one of Time Magazine's most influential people in the world, twice.[16]

28.     Due to Mr. West's unbridled success and outspoken social media presence,[17] his Twitter feed is regularly at the center of a maelstrom of discussion and scrutiny by both the media and public at large.[18] As a result, Mr. West has developed a robust and devout fan base,[19] with nearly *26 million* Twitter followers (although he himself only follows one person) and tweets that are often widely reported on by the popular media.

---

[15]     *See* Jamieson Cox, *Kanye West's new album Swish is coming out on February 11th*, The Verge (Jan. 8, 2016), http://www.theverge.com/2016/1/8/10739674/kanye-west-swish-new-album-release-date/in/10737069 (last visited Oct. 7, 2016) (reporting on Mr. West's announcement that his album (then titled "Swish") would be released in February, 2016).

[16]     *See 500 Greatest Albums of All Time*, Rolling Stone (May 31, 2012), http://www.rollingstone.com/music/lists/500-greatest-albums-of-all-time-20120531 (last visited Oct. 7, 2016); *Kanye West*, The Grammys, http://www.grammy.com/artist/kanye-west (last visited Oct. 6, 2016); Kadeen Griffiths, *Kanye West Makes TIME Magazine's Most Influential Cover & There's A Good Reason He Was Chosen For The Honor*, Bustle (April 16, 2015), http://www.bustle.com/articles/76739-kanye-west-makes-time-magazines-most-influential-cover-theres-a-good-reason-he-was-chosen (last visited Oct. 7, 2016).

[17]     *See* Harriet Gibsone, *No such thing as bad PR: Is social media saving or damaging the music industry*, The Guardian (Feb. 19, 2016), http://www.theguardian.com/music/2016/feb/19/social-media-damaging-music-industry-pr-twitter-kanye-west (last visited Oct. 7, 2017) (noting Mr. West's use of Twitter as part of the promotional process of his personal celebrity "brand").

[18]     *See #YeezySeason by the numbers: A look at Kanye West's beautiful dark twisted February on social media*, cramer-krasselt, http://c-k.com/yeezyseason-by-the-numbers-a-look-at-kanye-wests-beautiful-dark-twisted-february-on-social-media/ (last visited Oct. 7, 2016) (discussing the use of a social media monitoring tool to identify over ten million conversations using keywords associated with Mr. West in blogs, social media platforms, Twitter, and traditional news sites in February 2015 alone).

[19]     *See Kanye West*, Twitter, https://twitter.com/kanyewest (last visited Oct. 7, 2016).

29.     Despite Mr. West's wild success and popularity, and his personal claim as the most influential person in the world,[20] he has been plagued with an extraordinary amount of debt, which he declares currently exceeds fifty million dollars.[21] During this time of financial difficulty for Mr. West (and concurrent with Tidal's fiscal failings), he announced that his album would be available on Tidal in early 2016.[22] It quickly became one of the most anticipated albums of 2016.[23] As the release date arrived, Tidal marketed the exclusivity of the album, announcing to the world, via Twitter, that the album was streaming "exclusively" via Tidal. *See* Figure 2.



Figure 2.[24]

30.     In the same 24 hour period, Mr. West himself, in his capacity both as an artist and owner of Tidal, reaffirmed Tidal's statement of exclusivity by stating that his album would *only*

---

[20]     *See* Emily Smith, *'Don't f–k with me': Hear Kanye's uncensored 'SNL' meltdown* (Feb. 17, 2016), http://pagesix.com/2016/02/17/dont-f-k-with-me-hear-kanyes-uncensored-snl-meltdown/ (last visited Oct. 7, 2017).

[21]     *See* Emily Jane Fox, *Kanye West's $53 Million Debt, Explained*, Vanity Fair (Feb 17, 2016), http://www.vanityfair.com/news/2016/02/kanye-west-53-million-dollar-debt-explained (last visited Oct. 7, 2016).

[22]     *See* note 15 *supra*

[23]     *See* Tim Ingham, *Kanye West Says His New Album 'Will Only Be on Tidal'. Sadly, He's Wrong*, Music Business Worldwide (Feb. 16, 2016), http://www.musicbusinessworldwide.com/kanye-west-says-new-album-will-tidal-sadly-hes-wrong/ (last visited Oct. 7, 2016) (discussing the fervor of anticipation over *The Life of Pablo* and the resulting piracy frenzy).

[24]     *Tidal*, Twitter, (Feb. 14, 2016, 1:19 PM), https://twitter.com/TIDALHiFi/status/698980003233603586 (last visited Oct. 7, 2016).

be available on the Tidal streaming platform. Mr. West, as a part owner of Tidal, is an agent of the company and therefore capable of making representations on its behalf, including statements about his music appearing on the platform. *See* Figure 3.



KANYE WEST @kanyewest · Feb 15

My album will never never never be on Apple. And it will never be for sale... You can only get it on Tidal.

↩   🔁 37K   ♥ 51K   •••

Figure 3.[25]

31.     Mr. West's statement was a clear and unqualified representation that *The Life of Pablo* would be a permanent exclusive on Tidal.

32.     And Mr. West's declaration was not limited to the Twitterverse. Due to his personal and professional fame, and the massive amounts of hype and press coverage associated with the release of *The Life of Pablo*, numerous news outlets broadcast Mr. West's decree to the world with headlines like "Kanye West says his new album will be a permanent Tidal exclusive," "Kanye West says The Life Of Pablo Tidal exclusive," "Kanye West Says 'The Life Of Pablo' 'Will Never Be For Sale,'" and "Kanye West: You can only get The Life of Pablo on TIDAL."[26]

---

[25]     *Kanye West,* Twitter (Feb. 15, 2016, 3:34 PM), https://twitter.com/kanyewest/status/699376240709402624?lang=en (last visited Oct. 7, 2016).

[26]     *See* Angus Walker, *Kanye West Says "The Life Of Pablo" "Will Never Be For Sale"*, Hot New Hip Hop (Feb. 15, 2016), http://www.hotnewhiphop.com/kanye-west-says-the-life-of-pablo-will-never-be-for-sale-news.20192.html (last visited Oct. 7, 2017) (noting that Mr. West's representations that *The Life of Pablo* would be "confined to TIDAL"); Victor Luckerson, *Kanye West Is Making a Big, Risky Bet With Pablo*, TIME (Feb. 16, 2016), http://time.com/4226074/kanye-west-life-pablo-tidal/ (last visited Oct. 7, 2016) (reporting that *The Life of Pablo* would be available exclusively on Tidal based upon Mr. West's tweet); Sam Barsanti, *Kanye West says The Life Of Pablo Tidal exclusive*, A.V. Club (Feb. 15, 2016), http://www.avclub.com/article/kanye-west-says-life-pablo-now-tidal-exclusive-232299 (last visited October 18, 16); Jacob Kastrenakes, *Kanye West says his new album will be a permanent Tidal exclusive*, The Verge (Feb. 15, 2016), http://www.theverge.com/2016/2/15/11008932/kanye-life-of-pablo-tidal-exclusive-permanently (last visited Oct. 7, 2016).

33.     Consumers flocked to Tidal at a frenzied pace after Mr. West declared it would be the exclusive source of his album, and as a result, Tidal's subscription numbers skyrocketed.[27]

34.     Within the first ten days of *The Life of Pablo's* release, it was streamed over 250 million times and subscriber numbers eventually climbed from 1 million to 3 million.[28] This drastic increase was attributed directly to Mr. West (*See, e.g.,* the headlines "Kanye West's 'The Life Of Pablo' Reportedly Doubles TIDAL Subscriptions" and "Kanye West's New Album Saving Tidal").[29] Even Mr. West boasted his own impact on Tidal's subscriber numbers. *See* Figure 4.



Figure 4.[30]

35.     The permanent exclusivity announcements also pushed the Tidal mobile application to the very top of the download charts. *See* Figure 5.

---

[27]     *See* Stuart Dredge, *Tidal Riding High in US App Store's Top-Grossing Chart*, music :) ally (March 17, 2016), http://musically.com/2016/03/17/tidal-riding-high-in-us-app-stores-top-grossing-chart/ (last visited Oct. 7, 2016);

[28]     *See* Danette Chavez, note 2 *supra*; *see also* Joe Coscarelli, *400 Million Streams Later, Kanye West's 'Pablo' Gets a Wider Release*, The New York Times (March 31, 2016), http://www.nytimes.com/2016/04/02/arts/music/kanye-west-life-pablo-tidal-streams.html?_r=0 (last visited Oct. 7, 2016) (noting that songs from the album had been streamed over 400 million times as of Mar. 31, 2016).

[29]     *See* Danny Schwartz, *Kanye West's 'The Life Of Pablo' Reportedly Doubles TIDAL Subscriptions* (Feb. 23, 2016), http://www.hotnewhiphop.com/kanye-wests-the-life-of-pablo-reportedly-doubles-tidal-subscriptions-news.20313.html (last visited Oct. 7, 2016); Mark Lelinwalla, *Kanye West's New Album Saving Tidal* (Feb. 23, 2016), http://www.techtimes.com/articles/135993/20160223/kanye-wests-new-album-saving-tidal.htm (last visited Oct. 7, 2016).

[30]     *Kanye West*, Twitter (Mar. 2, 2016, 10:37 AM), https://twitter.com/kanyewest/status/705099712353968129 (last visited Oct. 7, 2016).



Figure 5.[31]

**The Unannounced Wide Release of _The Life of Pablo_**

36.     After reaping the benefits of the announced "exclusivity" with the Tidal platform, Mr. West quickly changed his tune.

37.     A month and a half after releasing _The Life of Pablo_, Mr. West publicly announced that his album would be available through numerous other media streaming platforms.[32]

38.     Specifically, Mr. West announced that the album would also be available for purchase through his own website (https://shop.kanyewest.com), and that it would be available for streaming through both Spotify and Apple Music (competitors of Tidal), which would now allow the album to be streamed for free.[33]

39.     At all times, Defendants knew that _The Life of Pablo_ would not be available

---

[31]     _Kanye West,_ Twitter, (Feb. 14, 2016, 8:36 PM), https://twitter.com/kanyewest/status/ 699089796690534401 (last visited Oct. 7, 2016).

[32]     _See Kanye West makes The Life of Pablo available outside Tidal_, The Guardian (April 1, 2016), http://www.theguardian.com/music/2016/apr/01/kanye-west-life-of-pablo-stream-download-spotify-itunes-tidal (last visited Oct. 7, 2016).

[33]     _See id._; _see also Kanye West_, Twitter (Mar. 31, 2016, 10:08 PM), https://twitter.com/ kanyewest/status/715767777823485953 (last visited Oct. 7, 2016) (providing hyperlink to an online marketplace for the purchase of _The Life of Pablo_ on Mr. West's Twitter feed).

exclusively through the Tidal streaming platform. Despite this knowledge, they supported the charade by making representations that the album would be a Tidal exclusive, either in their capacity as individuals or through Tidal as owners of the platform. Defendants knew that consumers would subscribe to Tidal only to get access to the new album, and in fact promoted that very fact. *See* Figure 6.



Figure 6.

40.    As such, Mr. West and Aspiro deceived consumers into believing that *The Life of Pablo* would only be available through the Tidal streaming service, when in fact it knew that statement to be false.

**Defendants Materially Benefited From Their Misrepresentations**

41.    Defendants reaped enormous benefits from the mass influx of new subscribers and the treasure trove of consumer data they collected from them.

42.    New companies like Tidal rely on user metrics to value their company for investors, potential buyers, and IPO pricing. For example, Facebook purchased WhatsApp for $19 billion ($42 per user), when it had less than $20 million in revenue. The market consensus was that the price, and choice to purchase the company at all, was based largely upon WhatsApp's massive and growing user base and incredible cache of user data.[34] A similar metric

---

[34]    *See* Steven Russolillo, *How to Value Facebook's $19 Billion WhatsApp Deal* (Feb. 21, 2014), blogs.wsj.com/moneybeat/2014/02/21/how-to-value-facebooks-19-billion-whatsapp-deal (last visited on Oct. 7, 2016) ("The deal initially elicited some sticker shock on Wall Street, but analysts and shareholders have increasingly come around to the fact that Facebook is paying up for WhatApp's vast user base… Some back-of-the-envelope math shows Facebook is paying just $42 per WhatsApp user, whereas Facebook trades at $145 per user and Twitter trades at $128 per user… Putting the fundamentals aside for a second, he notes that the market is clearing pricing many of these social-media companies on users, user growth and engagement.")

can be applied to Facebook's 2012 purchase of Instagram for $1 billion, or around $30 per user.[35] Using the price per user metrics applied to WhatsApp and Instagram, the inflation of Tidal's user base translates to between $60 and $84 million in ascertainable new value.

43.     Aspiro's parent company, SCE, knows the value of subscribers all too well. So well, in fact, that it is preparing to sue the two entities it purchased the Tidal platform from for allegedly overinflating subscriber numbers. SCE is reportedly seeking at least $15 million back from its $57 million purchase price because "the total number of subscribers was actually well below the 540,000 reported to us by the prior owners."[36] Based on its own math, the added value of the new subscribers and their information gained through *The Life of Pablo* false representations would be at least $60 million to the company's overall value.

44.     With each new user added comes a wealth of user information. In order to subscribe to Tidal, consumers are required to provide their email address and other contact information, which may include links to their personal social media accounts, including Facebook, Twitter, and Last.fm.[37] Each linking to a social media account provides Tidal with an even wider array of user data and information. Additionally, in order to secure certain package "plans," consumers may be prompted to provide Tidal with information regarding the school they attend (or previously attended), or even their current military status and branch of service.[38]

---

[35]     *See Why Instagram is worth $1B to Facebook* (Apr. 10, 2012), http://fortune.com/2012/04/10/why-instagram-is-worth-1b-to-facebook/ (last visited Oct. 7, 2017) (Facebook acquired Instagram for about $30 per user, or $1 billion. ($30/user X 33M users = $1B). Facebook is valued at about $100 per user or $80 billion ($100/user X 800M users = $80Bn). Other popular social apps are valued around $20 to $50 per user. The monetization models need to work out about the same to justify the valuations.") *See also* Tristan Louis, *How Much Is A User Worth?* (Aug. 31, 2013), http://www.forbes.com/sites/tristanlouis/2013/08/31/how-much-is-a-user-worth/#febe46592a9b (last visited Oct. 7, 2016).

[36]     *See* Kylie Noble, *Jay Z 'preparing to sue' former Tidal owners* (Mar. 31, 2016), http://www.theguardian.com/media/2016/mar/31/jay-z-tidal-owners-schibsted-verdane (last visited Oct. 7, 2016).

[37]     The sign up process also includes a *pre-checked* box that states, "Sign up for the TIDAL Editorial Newsletter and get weekly updates from our music experts."

[38]     *See TIDAL Student Plan information verification portal*, TIDAL, https://verify.sheerid.com/tidal-student/?vsid=464a1150-ae0d-4b99-863a-9fc6ee1ff63d (last

45.     After consumers provide this mandatory information in exchange for access to Tidal, the streaming service seeks even more data about each of its subscribers—including their location, gender, phone number, and birthday—in order to develop a more accurate (and valuable) profile of each consumer.

46.     Alarmingly, Tidal specifically targets the "personal information" of minors as young as 13 years old. For example, its Terms of Use state that "If you are between 13 and 17 years of age, when you visit, browse, use, *or submit personal information*" to Tidal, you "represent that you have the permission of a parent or guardian" to do so.[39]

47.     Once a consumer completes the sign-up process and starts using the service, Tidal begins collecting a massive amount of analytics data, user habits, and browsing history.[40] By increasing their user base multiple times over, Tidal is able to create valuable usage information to aid them in better monetizing their site as well sharing with or selling that information to third parties (such as record labels, artists on its platform, and other media companies).

48.     As a result of their misrepresentations, each Defendant, as a stakeholder of Tidal, benefitted from having their shares of Tidal increase in value.

## FACTS SPECIFIC TO PLAINTIFF BAKER-RHETT

49.     Plaintiff Baker-Rhett is a fan of Defendant Kanye West's music.

50.     Immediately after viewing Mr. West's February 15, 2016 announcement proclaiming that *The Life of Pablo* would be available exclusively on Tidal, Plaintiff Baker-Rhett downloaded and subscribed to the service in order to gain access to the album. As part of the sign up process, Plaintiff Baker-Rhett was required to provide Tidal with his personal and

---

visited Oct. 7, 2017); *TIDAL Military Plan information verification portal*, TIDAL, https://verify.sheerid.com/tidal-military/?vsid=93e65bdb-18ff-47d8-9adc-eac64ff89ebd (last visited Oct. 7, 2017).

[39]     *See Tidal Terms of Use*, http://tidal.com/us/terms (last visited Oct. 7, 2016) (emphasis added).

[40]     *See Install*, TIDAL, http://tidal.com/us/download (last visited Oct. 7, 2016) (identifying numerous devices and operating systems that Tidal can be utilized through, each of these methods of accessing Tidal has the potential to generate an additional wealth of data for each unique Tidal user's habits that can then be capitalized on in addition to their basic information).

payment information so Tidal could charge him for a subscription to its music-streaming platform after the free trial period ended.

51. After subscribing to Tidal, Plaintiff Baker-Rhett began to stream *The Life of Pablo* album that same day.

52. Plaintiff Baker-Rhett subscribed to Tidal specifically because he was misled into believing that it was the only music platform on which *The Life of Pablo* album would ever be available.

53. This was a result of viewing Tidal's and Mr. West's announcements and representations that *The Life of Pablo* would only ever be available on Tidal.

54. Had Plaintiff Baker-Rhett known that Mr. West's album would be available to stream through other platforms besides Tidal, particularly those that offer the album for free or one in which he already pays for (*e.g.*, his paid Spotify account), he would not have downloaded the Tidal app, provided his personal information, or paid for a subscription to Tidal's streaming service (for which he was charged $9.99 in March 2016).

55. Plaintiff cancelled his subscription after finding out that *The Life of Pablo* was not a Tidal exclusive and before he was charged a second time.

## CLASS ALLEGATIONS

56. **Class Definition**: Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of himself and a class of similarly situated individuals, defined as follows:

> **Class**: All persons in the United States who (1) subscribed or renewed their subscription to the Tidal streaming platform, (2) between February 15, 2016 and April 1, 2016, (3) and who streamed any track from *The Life of Pablo* album during the first 24 hours after subscribing.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers and directors; (3) persons who

properly execute and file a timely request for exclusion from the Class; (4) persons whose claims

in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's

counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns

of any such excluded persons.

57.     **Numerosity**: The exact number of members of the Class is unknown and is not

available to Plaintiff at this time, but individual joinder in this case is impracticable. The Class

likely consists of millions of individuals. Class members can be easily identified through

Defendants' records.

58.     **Commonality and Predominance**: There are many questions of law and fact

common to the claims of Plaintiff and the other members of the Class, and those questions

predominate over any questions that may affect individual members of the Class. Common

questions for the Class include but are not limited to the following:

a)      whether Defendants' representations were designed to mislead consumers
        into subscribing to the Tidal streaming service;

b)      whether Defendants' conduct described herein violates New York's
        Deceptive Practices Law (N.Y. Gen. Bus. Law § 349);

c)      whether Defendants' conduct described herein violates New York's False
        Advertising Law (N.Y. Gen. Bus. Law §§ 350 *et seq.*); and

d)      whether Defendants' conduct described herein constitutes fraudulent
        inducement.

59.     **Typicality**: Plaintiff's claims are typical of the claims of the other members of the

Class. Plaintiff and the Class sustained damages as a result of Defendants' uniform wrongful

conduct during transactions with Plaintiff and the Class.

60.     **Adequate Representation**: Plaintiff will fairly and adequately represent and

protect the interests of the Class, and has retained counsel competent and experienced in

complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class,

and Defendant has no defenses unique to Plaintiff.

61.     **Policies Generally Applicable to the Class**: This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class, and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply and affect the members of the Class uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

62.     **Superiority**: This case is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The injuries suffered by the individual members of the Class are likely to have been relatively small compared to the burden and expense of individual prosecution of the litigation necessitated by Defendants' actions. Absent a class action, it would be difficult, if not impossible, for the individual members of the Class to obtain effective relief from Defendants. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented herein. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

## FIRST CAUSE OF ACTION
### Violation of New York's Deceptive Practices Law
### N.Y. Gen. Bus. Law § 349
### (On Behalf of Plaintiff and the Class)

63.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

64.     New York's Deceptive Practices Law, Gen. Bus. Law § 349, protects consumers against "deceptive acts or practices in the conduct of any business, trade or commerce or in the

furnishing of any service" in the state of New York.

65.     As described herein, Defendants engaged in deceptive business practices by, among other things, misrepresenting that *The Life of Pablo* album would only be available via the Tidal music-streaming platform and using the misrepresentations to induce consumers (like Plaintiff and the Class) into subscribing to their music-streaming platform when, in fact, *The Life of Pablo* was not a Tidal only exclusive (nor did Defendants intend it to be).

66.     Specifically, Mr. West—via his Twitter account—represented to his fans and the public at large that the album would only ever be available through the Tidal platform. Mr. West made this representation knowing that various media outlets would ensure it was broadcast to consumers the world over—in particular, consumers of his music. Moreover, Aspiro and Mr. West also represented to consumers that Tidal would be the exclusive method of listening to the album via Tidal's Twitter feed and other representations made by Tidal.

67.     Aspiro then failed to correct any statements made by Mr. West, or otherwise indicate that the album would not be a permanent exclusive on Tidal. Rather, Aspiro continued to accept subscription funds from new users despite knowing that Mr. West's tweets had driven millions to subscribe under the mistaken belief that *The Life of Pablo* would never be available outside of a Tidal subscription. Mr. West likewise failed to correct his prior misrepresentations.

68.     Defendants intentionally misrepresented the exclusive nature of *The Life of Pablo* and failed to correct those misrepresentations, because they knew those misrepresentations had allowed Tidal to triple its subscriber base, and that correction would have resulted in a substantial loss of subscribers.

69.     Defendants' deceptive statements regarding the exclusivity of *The Life of Pablo* album were materially untrue, misleading, and likely to deceive the public inasmuch as their advertisements and statements caused reasonable consumers, including Plaintiff, to mistakenly believe that *The Life of Pablo* would only be available via the Tidal music-streaming platform.

70.     Defendants' material misrepresentations regarding the exclusive availability of *The Life of Pablo* directly affected Plaintiff's and the Class members' choices to subscribe to the

Tidal streaming service, including providing their personal information, social media information, and credit card information to Tidal.

71.    Plaintiff and the Class chose to subscribe to Tidal specifically because of Defendants' promises that *The Life of Pablo* album would only be available via Tidal.

72.    Plaintiff and the Class reasonably viewed the public statements made by Mr. West and Aspiro via Twitter—and rebroadcast by the media—regarding *The Life of Pablo* as true, and as a direct and proximate result, subscribed to Tidal based on those representations that it would be the exclusive source of the album.

73.    Had Mr. West or Aspiro corrected their misrepresentations and clarified that *The Life of Pablo* would eventually have been available through more popular media platforms such as Spotify, Apple Music, or even Mr. West's own website, Plaintiff and millions of consumers would have been willing to wait for the widespread availability of the album.

74.    Accordingly, had Plaintiff and the Class known that *The Life of Pablo* was not a Tidal only exclusive, they would not have been willing to pay as much (if at all) for a $9.99/month Tidal subscription, provide their personal information, social media information, and credit card information to Tidal, or otherwise subscribe to Tidal.

75.    Thus, as a direct and proximate result of Defendants' deceptive practices, Plaintiff and the Class have suffered actual injury in the form of personal information that they would not otherwise have provided, in addition to overpayment to Defendants.

76.    By all of the above, Defendants engaged in willful and knowing violations of N.Y. Gen. Bus. Law § 349 by engaging in deceptive and materially misleading business practices directed at consumers which caused consumers actual harm.

77.    Therefore, Plaintiff, on behalf of himself and the Class, seeks an order pursuant to N.Y. Gen. Bus. Law § 349(h) awarding a minimum of $50 in damages to Plaintiff and each Class member who suffered injury as a result of Defendants' deceptive practices.

78.    Because Defendants' conduct was willful and knowing, Plaintiff and the putative Class seek treble damages pursuant to N.Y. Gen. Bus. Law § 349(h).

**SECOND CAUSE OF ACTION**
**Violation of New York's False Advertising Law**
**N.Y. Gen. Bus. Law §§ 350 *et seq.***
**(On Behalf of Plaintiff and the Class)**

79.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

80.     Defendants engaged in advertising and marketing to consumers throughout the United States, including in New York, that encouraged them to subscribe to Tidal by promising them that *The Life of Pablo* album would be exclusive to its music-streaming service.

81.     As described herein, Defendants engaged in false advertising by, among other things, misrepresenting that *The Life of Pablo* album would only be available via the Tidal music-streaming platform and using the misrepresentations to induce consumers (like Plaintiff and the Class) into subscribing to their music-streaming platform when, in fact, *The Life of Pablo* was not a Tidal only exclusive (nor did Defendants intend it to be).

82.     Specifically, Mr. West—via his Twitter account—represented to his fans and the public at large that the album would only ever be available through the Tidal platform. Mr. West made this representation knowing that various media outlets would ensure it was broadcast to consumers the world over—in particular, consumers of his music. Moreover, Aspiro and Mr. West also represented to consumers that Tidal would be the exclusive method of listening to the album via Tidal's Twitter feed and other representations made by Tidal.

83.     Aspiro then failed to correct any statements made by Mr. West, or otherwise indicate that the album would not be a permanent exclusive on Tidal. Rather, Aspiro continued to accept subscription funds from new users despite knowing that Mr. West's tweets had driven millions to subscribe under the mistaken belief that *The Life of Pablo* would never be available outside of a Tidal subscription. Mr. West likewise failed to correct his prior misrepresentations.

84.     Defendants intentionally misrepresented the exclusive nature of *The Life of Pablo* and failed to correct those misrepresentations, because they knew those misrepresentations had allowed Tidal to triple its subscriber base, and that correction would have resulted in a substantial loss of subscribers.

85.     Despite Defendants' public advertising and marketing statements that *The Life of Pablo* would only be available via the Tidal music-streaming platform, *The Life of Pablo* was not a Tidal only exclusive (nor did Defendants intend it to be).

86.     Defendants' advertising and marketing statements regarding the exclusivity of *The Life of Pablo* album were materially untrue, misleading, and likely to deceive the public inasmuch as their advertisements and statements caused consumers to mistakenly believe that *The Life of Pablo* would only be available via the Tidal music-streaming platform.

87.     Plaintiff and members of the Class were exposed to and relied on relied on Defendants' statements in deciding to subscribe to the Tidal music-streaming platform, including by providing their personal information and paying the monthly subscription fee.

88.     Plaintiff and members of the Class could not have known that Defendants never planned for *The Life of Pablo* to be exclusively on Tidal.

89.     But for Defendants' false and misleading advertisements and marketing statements, Plaintiff and the Class members would not have subscribed to Tidal.

90.     Thus, as a direct and proximate result of Defendants' false advertising, Plaintiff and the Class have suffered actual injury in the form of personal information that they would not otherwise have provided, in addition to overpayment to Defendants.

91.     By all of the above, Defendants engaged in willful and knowing violations of N.Y. Gen. Bus. Law §§ 350 *et seq.*, falsely advertising the exclusivity of *The Life of Pablo* on Tidal, which materially misled consumers and caused them actual harm.

92.     Therefore, Plaintiff, on behalf of himself and the Class, seeks an order pursuant to N.Y. Gen. Bus. Law §§ 350 *et seq.* awarding a minimum of $500 in damages to Plaintiff and each Class member who suffered injury as a result of Defendants' false advertising.

93.     Because Defendants' conduct was willful and knowing, Plaintiff and the putative Class members seek treble damages pursuant to N.Y. Gen. Bus. Law § 350-e(3).

94.     Further, Plaintiff, on behalf of himself and other members of the Class, seek an order under N.Y. Gen. Bus. Law § 350-e(3) enjoining Defendants' unlawful advertising practices described herein.

### THIRD CAUSE OF ACTION
**Fraudulent Inducement**
**(On Behalf of Plaintiff and the Class)**

95.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

96.     By tweeting that *The Life of Pablo* would only ever be available on Tidal, Mr. West and Tidal (through its agent, Mr. West), falsely represented that any consumer wanting to listen to the album had to subscribe to Tidal. Mr. West and Tidal made these statements with knowledge of their falsity.[41]

97.     Mr. West and Pablo misrepresented the exclusive nature of *The Life of Pablo* specifically with the intention of inducing consumers who would not otherwise subscribe to Tidal to do so. Defendants confirmed as much in the immediate aftermath of Mr. West's exclusivity tweets, with Mr. West and Aspiro both imploring consumers to subscribe to Tidal, and subsequently boasting of *The Life of Pablo's* dramatic positive effect on subscriptions.

98.     Worse still, Mr. West and Aspiro both knowingly failed to correct their previous misrepresentations, and instead continued to reap the benefits of the hype caused by *The Life of Pablo's* supposedly exclusive release, including through the receipt of millions of dollars in additional subscription revenue and millions of dollars' worth of valuable new subscriber data, even though they knew that consumers were subscribing to Tidal solely for access to *The Life of Pablo*. Defendants failed to correct their misrepresentations intentionally, so that they would not disrupt the steady stream of new subscribes gained by *The Life of Pablo's* supposedly exclusive release.

---

[41]     In fact, sources within Tidal knew at the time of, and in the immediate aftermath of, Mr. West's tweets that *The Life of Pablo* would be imminently released through other media. *See* Dan Rys and Andrew Flanagan, *Kanye West Says 'The Life of Pablo' Will Never Be For Sale and Only on Tidal, Sources Express Confusion*, Billboard (Feb. 15, 2016), http://www.billboard.com/articles/columns/hip-hop/6875372/kanye-west-life-of-pablo-never-for-sale-only-tidal-sources-confused (last accessed Oct. 7, 2016.)

99.     Defendants' misrepresentations and omissions were successful. As a direct result of Defendants' misrepresentations that *The Life of Pablo*, two million new consumers subscribed to Tidal.

100.    Plaintiff was one such customer. After viewing Mr. West's tweet that *The Life of Pablo* would never be available outside of Tidal, and seeing on Tidal's website that *The Life of Pablo* would be streaming exclusively on Tidal, Plaintiff subscribed to Tidal. Had Defendants not misrepresented the exclusive nature of *The Life of Pablo*, or had they corrected their misrepresentations, Plaintiff would not have subscribed to Tidal at the prices charged or surrendered his valuable personal information for the same.

101.    In light of the foregoing, Plaintiff Baker-Rhett seeks an order requiring Mr. West and Aspiro to pay actual and compensatory damages.

102.    Plaintiff further requests that if the Court finds that Mr. West and Aspiro'ss conduct and misrepresentations were made with malice and in conscious disregard for Plaintiff Baker-Rhett and the Class's rights, they should be awarded punitive damages against Mr. West and Aspiro in an amount to deter such conduct in the future.

103.    Further, Plaintiff seeks an order requiring all personal and credit card information wrongly acquired by Defendants be destroyed, an order directing Defendants to cancel the negative option aspects of all outstanding free trials created during the class period, and an order directing Defendants to cease any monetization efforts relying on Class members' information.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Baker-Rhett, individually and on behalf of the Class, respectfully requests that the Court enter an order:

A.      Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff Baker-Rhett as representative of the Class, and appointing his counsel as Class Counsel;

B.      Declaring that Defendants' actions, as set out above, constitute violations of N.Y.

Gen. Bus. Law § 349 and N.Y. Gen. Bus. Law §§ 350 *et seq.*, and fraudulent inducement;

C.      Awarding actual damages and punitive damages where applicable, to Plaintiff and the Class in an amount to be determined at trial;

D.      Awarding appropriate restitution to Plaintiff Baker-Rhett and the Class in an amount to be determined at trial;

E.      Requiring Defendants to cease all monetization efforts that rely on their personal data;

F.      Requiring the destruction of all personal data in Defendants possession belonging to Plaintiff and members of the Class;

G.      Requiring Defendants to cancel the negative option aspects of all outstanding free trials created during the class period;

H.      Awarding injunctive and other equitable relief as is necessary to protect the interests of the Class, including, *inter alia,* an order prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

I.      Awarding reasonable litigation expenses and attorneys' fees;

J.      Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable; and

K.      Awarding such further and other relief the Court deems reasonable and just.

## JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

Dated: October 18, 2016            By: /s/ J. Dominick Larry
                                        One of Plaintiff's Attorneys

                                   Fred D. Weinstein
                                   fweinstein@kelaw.com
                                   KURZMAN EIZENBERG CORBIN & LEVER, LLP
                                   One North Broadway

White Plains, NY 10601
Tel: 914.285.9800
Fax: 914.285.9855

Jay Edelson (*pro hac vice* to be sought)
jedelson@edelson.com
Benjamin H. Richman (Admitted *pro hac vice*)
brichman@edelson.com
J. Dominick Larry (Admitted *pro hac vice*)
nlarry@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Attorneys for Plaintiff and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on October 18, 2016, I served the above and foregoing by causing a true and accurate copy of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system.

          By: <u>/s/ J. Dominick Larry</u>