USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/22/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
JUSTIN BAKER-RHETT, individually and :
on behalf of others similarly situated, :
   :
                        Plaintiff, : 1:16-cv-5801-GHW
   :
            -against- : MEMORANDUM OPINION
   : AND ORDER
ASPIRO AB, a Norwegian limited liability :
company, and KANYE WEST, an :
individual, together d/b/a/ TIDAL, :
   :
                        Defendants. :
-----------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

On February 15, 2016, Kanye West tweeted that his new album—*The Life of Pablo*—"will never never never be on Apple. And it will never be for sale . . . You can only get it on Tidal." Six weeks later, the album was on Apple, and was for sale on sites other than Tidal, the online streaming service operated by defendant Aspiro AB ("Aspiro"). The plaintiff, Mr. Baker-Rhett, on behalf of himself and a putative class, claims that statements by Aspiro and Mr. West were deceptive—and that they fraudulently induced him to pay for Tidal's services in order to obtain access to its purportedly exclusive content. Mr. West's allegedly false Tweet provides adequate support for the plaintiff's common law fraudulent inducement claims. However, because Mr. Baker-Rhett viewed the allegedly false representations and subscribed to Tidal outside of New York, he does not satisfy the territoriality requirement for the claims he asserts under Sections 349 and 350 of New York's General Business law. For those, and the other reasons set forth below, the defendants' motions to dismiss are GRANTED in part and DENIED in part.

I. **BACKGROUND**[1]

   A. **Aspiro Struggles**

Aspiro launched Tidal—a high fidelity music streaming site—in 2014. Second Am. Compl. (ECF No. 59) ¶ 20. Shortly thereafter, Aspiro was acquired by rap impresario Sean Carter—known to the world as Jay-Z—and a holding company controlled by him. *Id.* ¶ 21. Mr. Carter announced to the world that Tidal would be "the streaming home" for artists like himself and other bold faced names in the music industry. *Id.* ¶ 22. Tidal was marketed as the first "artist-owned" streaming service, and a number of musicians, including defendant Kanye West, were offered 3% stakes in the company "in exchange for creating Tidal exclusive content to drive consumers to the subscription only streaming site." *Id.* ¶¶ 22-23.

The artist-owners of Tidal leveraged their massive presence on social media to promote Tidal. *Id.* ¶ 24. For example, in February 2015, Mr. West tweeted his millions of Twitter followers: "Please to all my friends fans and music lovers. Sign up to Tidal now." *Id.*

Despite the sizzle created by the marketing efforts of Tidal's owner-artists, the service itself soon fizzled. *Id.* ¶ 25. Indeed, Tidal's "inability to generate revenue led many in the music industry to believe the media platform faced almost imminent doom." *Id.* Tidal admitted in early 2015 that the company had insufficient funds to last for another year; and conceded that it would "have to achieve an extreme and unprecedented growth in number of subscribers simply to survive." *Id.*

   B. **Pablo to the Rescue**

In the midst of Tidal's struggles, Mr. West announced that his next album—*The Life of Pablo*—would be released exclusively on the streaming platform. According to the complaint, Mr.

---

[1] Unless otherwise noted, the facts are taken from the complaint and are accepted as true for the purposes of this motion. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

West is a "musical paragon." *Id.* ¶ 27. There is no doubting Mr. West's success as a musician; among his other accomplishments, he has twenty-one Grammy awards. *Id.* He has a robust following on social media. With over 26 million followers, "his Twitter feed is regularly at the center of a maelstrom of discussion and scrutiny by both the media and public at large." *Id.* ¶ 28. "Despite Mr. West's wild success and popularity, and his personal claim as the most influential person in the world, he has been plagued with an extraordinary amount of debt . . . ." *Id.* ¶ 29. It was against this backdrop of financial struggle, by both Tidal and Mr. West himself, that Mr. West announced the release of his album on Tidal in early 2016. *Id.* "It quickly became one of the most anticipated albums of 2016." *Id.*

Tidal marketed that the album was available exclusively on Tidal. *Id.* In the first of the series of two Tweets that form the principal basis for Plaintiff's claims here, on February 14, 2016, the official Tidal Twitter account issued the following Tweet: "We're bringing @KanyeWests's #TLOP to fans around the globe. It's streaming exclusively on TIDAL.com." *Id.* The next day, February 15, 2016, Mr. West tweeted from his Twitter account: "My album will never never never be on Apple. And it will never be for sale . . . You can only get it on Tidal." *Id.* ¶ 30. The complaint alleges that Mr. West wrote his Tweet "both as an artist and owner of Tidal," and that he, "as a part owner of Tidal, is an agent of the company and therefore capable of making statements on its behalf." *Id.*

The press reported on Mr. West's Tweet in stories with headlines like "Kanye West says his new album will be a permanent Tidal exclusive," "Kanye West Says 'The Life of Pablo' 'Will Never Be For Sale'" and "Kanye West: You can only get The Life of Pablo on TIDAL." *Id.* ¶ 32. "Customers flocked to Tidal at a frenzied pace after Mr. West declared it would be the exclusive source of his album, and as a result, Tidal's subscription numbers skyrocketed." *Id.* ¶ 33. Indeed, within the first ten days of the release of *The Life of Pablo*, Tidal's subscription numbers tripled from

1 million to 3 million.  *Id.* ¶ 34.  Mr. West boasted to his Twitter followers about their impact on the increase in Tidal's subscription base.  *Id.*

*The Life of Pablo* was available exclusively on Tidal for about a month and a half before Mr. West announced that it would be available for free streaming on both Apple Music and Spotify—somewhat less than Mr. West's tweeted "never never never."  *Id.* ¶¶ 37-38.  The complaint alleges that the defendants always knew that *The Life of Pablo* would not be available exclusively on Tidal forever.  *Id.* ¶ 39.  "As such, Mr. West and Aspiro deceived customers into believing that *The Life of Pablo* would only be available through the streaming service, when in fact it [sic] knew that statement to be false."  *Id.* ¶ 40.  The complaint claims that the defendants benefited from their alleged fraud as a result of Aspiro's increased subscriber base and subscription revenue.

### C.  Mr. Baker-Rhett Loses $9.99

The named plaintiff, Mr. Baker-Rhett, lives in California.  *Id.* ¶ 14.  He is a fan of Mr. West's music.  *Id.* ¶ 49.  Immediately after Mr. West's February 15, 2016 Tweet, Mr. Baker-Rhett signed up for Tidal's streaming service.  *Id.* ¶ 50.  As "a result of viewing Tidal's *and* Mr. West's announcements and representations that *The Life of Pablo* would only ever be available on Tidal," Mr. Baker-Rhett believed it was the only music platform on which the album would ever be available. *Id.* ¶ 53 (emphasis added).  He began to stream *The Life of Pablo* that same day.  *Id.* ¶ 51.

The first month of Mr. Baker-Rhett's subscription to Tidal was free.  *Id.* ¶ 50.  But before he learned that the album would be available on streaming sites other than Tidal, he was charged $9.99 for his second month.  *Id.* ¶ 54.  After learning that the album would be available on Spotify, for which he already had a paid subscription, Mr. Baker-Rhett cancelled his subscription to Tidal.  *Id.* ¶¶ 54-55.  The cancellation was effective before he was charged for a second time.  *Id.* ¶ 55.  Mr. Baker-Rhett asserts that had he known that Mr. West's album would eventually be made available to stream on platforms other than Tidal, he would never have signed up for the service at all.  *Id.* ¶ 54.

As a result of the defendants' allegedly deceptive Tweets, Mr. Baker-Rhett was out $9.99. *Id.* He launched this lawsuit to get it back.

**D. Procedural History**

Plaintiff filed this action in the Northern District of California against Mr. West, who resides in California, and S. Carter Enterprises, LLC. ECF No. 1. The factual predicate of the original complaint was very similar to that pleaded in the governing complaint in effect now. Significantly, however, the original complaint asserted claims arising under California state law—particularly California's false advertising law, Cal. Bus. & Prof. Code § 17500, unfair competition law, Cal. Bus. & Prof. Code § 17200, *et seq.*, and California common law of fraudulent inducement and unjust enrichment. *Id.* ¶¶ 64-101. The plaintiff amended his complaint on May 9, 2016, replacing defendant S. Carter Enterprises, LLC, with Aspiro, but continuing to assert claims under California law. ECF No. 5. After Aspiro filed a motion to transfer venue of the litigation to the Southern District of New York, the parties entered into a stipulation to transfer the case to this district. ECF No. 23.

Some months after the case was transferred to this district, Aspiro filed a motion to dismiss the first amended complaint, arguing, among other things, that New York substantive law should apply to the plaintiff's claims, and that, as a result, the claims governed by California law should be dismissed. ECF No. 49. The motion relied heavily on the effect of the choice of law provision contained in the "Terms and Conditions" to which Mr. Baker-Rhett and other Tidal subscribers agreed in order to sign up for the service. That provision read as follows:

> The Agreement is governed by the internal substantive laws of the State of New York, without respect to its conflict of laws provisions. If there is any dispute between you and Supplier about or involving the Service, by using the Service, you expressly agree to submit to the exclusive personal jurisdiction of the state and federal courts sitting in the State of New York, County of New York.

5

ECF No. 52-2 at 12.

Aspiro's memorandum of law in support of its motion analyzed the application of this governing law provision under California law. First Aspiro Mem. of Law (ECF No. 50) ("First Aspiro Mem."), at 8. In the first step of the analysis, Aspiro asserted that the claims contained in the complaint fell within the scope of the contractual governing law provision when analyzed under California law. Aspiro wrote that "California courts take a liberal approach to governing law provisions in agreements. *Unlike in New York*, California courts do not require contracting parties to explicitly state that the governing law provision will apply to claims tangential to the agreement, as well as those pertaining to the contract itself." *Id.* (emphasis added). Aspiro argued that, as a result of the governing law clause "any claims relating to the service, including his relationship with the service provider, would be governed by New York state laws." *Id.* at 7. Aspiro claimed that "[t]his choice of law provision further encompasses 'any dispute between you and [Aspiro] about or involving the Service.'" *Id.* at 9.[2] The Court highlights the fact that Aspiro's argument was expressly tethered to California law, and stated that the result would be different if analyzed under New York law.

In the second step of its analysis of the governing law clause applying California law, Aspiro argued that New York bore a substantial relationship to the plaintiff's claims. *Id.* at 10. As part of its argument, Aspiro asserted that "While Aspiro itself and all aspects of the sign-up process for Tidal are managed outside the United States, the individuals that approve the sending of Tweets from Tidal's Twitter account, including the Tweet referenced in paragraph 30 of the Complaint, are based in New York." *Id.* (citing Tibon Decl. (ECF No. 51) ¶ 3).

---

[2] Aspiro's argument here arguably misquotes the text of the choice of law provision. The quoted language in Aspiro's argument is found in the second sentence of the provision, which relates to choice of venue. The parties agree to venue in New York for any dispute related to the services under the agreement. The choice of law provision contained in the first sentence of the provision is narrower—New York law is stated to govern the "Agreement," *not* all disputes related to the services.

6

The plaintiff decided not to oppose Aspiro's motion to dismiss the first amended complaint. Instead, the plaintiff entered into a stipulation to dismiss the California claims and amend the complaint. Stipulation Regarding Dismissal and Proposed Second Am. Class Action Compl. (ECF No. 58) ("Stipulation of Dismissal"). In the Stipulation of Dismissal, the plaintiff wrote that "After reviewing the arguments and authorities in Aspiro's dismissal papers, Plaintiff has concluded that, in the interests of justice and efficiency, his claims should properly be asserted under New York law." *Id.* ¶ 5. The parties went on to agree that the plaintiff would dismiss his claims under California statutory law with prejudice as to himself, but without prejudice as to the putative class. *Id.* ¶¶ A, B. The plaintiff specifically reserved his right to bring analogous claims under New York law. *Id.* The plaintiff also agreed to dismiss his fraudulent inducement and unjust enrichment claims—the latter with prejudice as to himself, but not as to any putative class. *Id.* ¶¶ C, D. The Stipulation of Dismissal set a deadline for the submission of a proposed Second Amended Complaint. *Id.* ¶ E. The Court "So Ordered" the parties' Stipulation of Dismissal on October 17, 2016. *Id.* at 5.

The plaintiff filed his Second Amended Complaint on October 18, 2016. ECF No. 59. In it, for the first time, the plaintiff asserted claims under Sections 349 and 350 of New York State's General Business Law, and for fraudulent inducement. *Id.* at 17-23. Both Aspiro and Mr. West filed motions to dismiss the claims brought in that complaint. ECF Nos. 96, 99. Those motions are the subject of this opinion.

## II. LEGAL STANDARD

The defendants seek dismissal under both Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). To determine plausibility, courts follow a "two-pronged approach." *Ashcroft v. Iqbal*, 556

7

U.S. 662, 679 (2009). "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (alterations and internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678). Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Claims sounding in fraud are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy that requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).

In resolving a motion to dismiss under Rule 12(b)(6), courts generally may not consider materials extrinsic to the complaint. Fed. R. Civ. P. 12(d). However, that rule is not absolute. In addition to the facts alleged in the complaint, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI*, 493 F.3d at 98. Courts may also consider "matters of which judicial notice may be taken," *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted).

Pursuant to Rule 12(b)(1), a court must dismiss a claim if, among other things, it determines that the plaintiff lacks standing to prosecute it. *Bldg. & Constr. Trades Council v. Downtown Dev., Inc.*, 448 F.3d 138, 144 (2d Cir. 2006). When a Rule 12(b)(1) challenge is brought on the basis of the pleadings, a court is required to accept as true "all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Id.* However, the burden remains with the party asserting jurisdiction to allege facts demonstrating standing. *See, e.g.*, *Johnson v. Bryson*, 851 F. Supp. 2d 688, 699 (S.D.N.Y. 2012). The Court may, if necessary, rely on evidence outside the pleadings in deciding a Rule 12(b)(1) motion. *Cortlandt St. Recovery Corp. v. Hellas Telecomm., S.à.r.l*, 790 F.3d 411, 417 (2d Cir. 2015).

Since this case is brought as a putative class action, it should be highlighted that Article III "[s]tanding cannot be acquired through the back door of a class action." *Wallace v. Ahearn*, No. 13 Civ. 2520, 2014 WL 4659307, at *9 (E.D.N.Y. July 15, 2014) (quoting *Allee v. Medrano*, 416 U.S. 802, 829 (1974) (Burger, C.J., concurring in part and dissenting in part)). Rather, "the named class plaintiffs must allege and show that they personally have been injured, not that the injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, LLC*, 433 F.3d 181, 199 (2d Cir. 2005) (quotation marks and citations omitted). Thus, "'for every named defendant there must be at least one named plaintiff who can assert a claim directly against that defendant, and at that point standing is satisfied and only then will the inquiry shift to a class action analysis.'" *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, LLC*, 504 F.3d 229, 241 (2d Cir. 2007) (quoting 1 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 2:6 n.3 (4th ed. 2002)).

### III. DISCUSSION

The plaintiff has brought claims against the defendants for (1) violations of Sections 349 and

350 of New York State's General Business Law, and (2) fraudulent inducement. The defendants claim that plaintiff lacks standing to assert his New York statutory claims, and that the Tweets at issue cannot form the basis for a claim of fraudulent inducement because they were true at the time made. The Court analyzes each of those arguments in turn below.

### A. Mr. Baker-Rhett Lacks Standing to Sue Under the NY GBL

Mr. Baker-Rhett lacks standing to sue under Sections 349 and 350 of the New York General Business Law in connection with the alleged transactions. Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a). Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state." *Id.* § 350. To establish a claim under either Section 349 or Section 350, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *City of New York v. Smokes–Spirits.Com, Inc.,* 12 N.Y.3d 616, 621 (2009) (citation omitted); *see also Koch v. Acker, Merrall & Condit Co.,* 18 N.Y.3d 940, 941 (2012).

"Sections 349 and 350 contain a 'territoriality' requirement: to state a claim under either provision, the deception of consumers must occur in New York." *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 547 (S.D.N.Y. 2014) (citing *Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 325 (2002); *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 124 (2d Cir. 2013)). "[T]o state a claim under either Section 349 or Section 350, the plaintiffs must show, at the very least, that the deceptive transaction occurred in New York in order to satisfy the territorial requirement." *Id.*; *see also Cline v. TouchTunes Music Corp.*, 211 F. Supp. 3d 628, 631-33 (S.D.N.Y. 2016).

There are no allegations that the alleged deceptive transaction involving Mr. Baker-Rhett occurred in New York. It is not alleged that Mr. Baker-Rhett viewed the allegedly deceptive Tweets

in New York, or that he subscribed to the Tidal service in New York—it may be that he did so in California where he resides and where he first brought this suit. The only link that Mr. Baker-Rhett can point to in order to establish a link to New York is the choice of law and venue provision in the "Terms and Conditions" that he agreed to when he signed up for the service.

The language of the governing law provision contained in the "Terms and Conditions" agreed to by Mr. Baker-Rhett does not extend New York law to all aspects of Mr. Baker-Rhett's relationship with Aspiro. Under New York law, "a choice-of-law provision indicating that the *contract* will be governed by a certain body of law does not dispositively determine that law which will govern a claim of *fraud* arising incident to the contract." *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (citation omitted). "Under New York law, in order for a choice-of-law provision to apply to claims for tort arising incident to the contract, the express language of the provision must be 'sufficiently broad' as to encompass the entire relationship between the contracting parties." *Id.* (citation omitted). The governing law clause at issue here is not so broad. It states only that the "Agreement is governed by the internal substantive laws of the State of New York." The parties' contractual agreement is governed by New York law, but the governing law clause does not override the territorial constraints contained in Sections 349 and 350 of the General Business Law.

The choice of venue provision in the "Terms and Conditions" is also insufficient to establish that Mr. Baker-Rhett can bring claims under the New York statute. "[T]he mere fact that parties agreed to be bound by New York law and to resolve their disputes in courts in New York does not, in itself, provide any indication as to where a transaction occurred." *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d at 547-548.

The doctrine of judicial estoppel does not save Mr. Baker-Rhett's statutory claims. The plaintiff, understandably perturbed by the defendants' apparent *volte-face*, argues that the doctrine of judicial estoppel prohibits the defendants from arguing that Mr. Baker-Rhett cannot bring claims

11

under New York law, given that they had argued in the First Aspiro Memorandum of Law that the governing law clause in the "Terms and Conditions" precluded him from bringing analogous claims under California law.

The doctrine of judicial estoppel does not apply here, however, because the Court took no action on the basis of Aspiro's arguments. "The purpose of judicial estoppel 'is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.' It prevents a party from asserting a 'factual position . . . clearly inconsistent' with a position previously advanced by that party and 'adopted by . . . the court in some manner.'" *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 397 (2d Cir. 2011) (internal citations omitted).

In *New Hampshire v. Maine,* 532 U.S. 742 (2001), the Supreme Court identified "several factors" that "typically inform the decision whether to apply the doctrine in a particular case":

> First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. . . . A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id.* at 750-51 (internal quotation marks and citations omitted). The Second Circuit "has consistently limited the application of judicial estoppel to 'situations where a party both takes a position that is inconsistent with one taken in a prior proceeding, and has had that earlier position adopted by the tribunal to which it was advanced.'" *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 148 (2d Cir. 2005) (quoting *Stichting v. Schreiber*, 407 F.3d 34, 45 (2d Cir. 2005)). In particular, an agreement between parties to settle a prior action does not satisfy the second of those two requirements: a "settlement neither requires nor implies any judicial endorsement of either party's claims or theories, and thus a settlement does not provide the prior success necessary for judicial estoppel." *Bates v. Long Island*

*R.R. Co.*, 997 F.2d 1028, 1038 (2d Cir. 1993) (internal citation and quotations omitted).

Judicial estoppel does not apply here because the Court did not adopt the argument advanced by Aspiro in its motion to dismiss the first amended complaint. The plaintiff decided to enter into the Stipulation of Dismissal based on his analysis of the arguments raised in Aspiro's motion. Stipulation of Dismissal ¶ 5. The Court "So Ordered" the stipulation to which the parties voluntary agreed, but never evaluated or adopted the arguments by Aspiro that persuaded the plaintiff to do so.[3] The parties' agreed Stipulation of Dismissal was the functional equivalent of a settlement, and does not trigger the application of judicial estoppel.

Because the alleged deceptive transaction involving Mr. Baker-Rhett did not have a sufficient nexus to New York, the claims by him arising under Sections 349 and 350 of New York's General Business Law are dismissed without prejudice.

### B. Mr. West's Tweet Supports Fraudulent Inducement Claim[4]

The plaintiff has adequately pleaded fraudulent inducement with respect to Mr. West's Tweet asserting that *The Life of Pablo* would "never, never, never" be available on Apple. Proof of fraudulent inducement under New York law "requires a showing that '(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the

---

[3] Because the plaintiff's argument founders on this point, the Court does not need to consider whether Aspiro's position was, indeed, inconsistent. It may not have been: Aspiro clearly noted in its memorandum to dismiss the first amended complaint that the analysis that it was presenting was based on an application of California law, and that New York law commanded a different result. The plaintiff may have expected that accepting Aspiro's argument and entering the Stipulation of Dismissal would open the door to a nationwide class action lawsuit applying New York statutory law, but the seed of this motion was planted at the time of Aspiro's first motion to dismiss, even if it was not yet seen. Moreover, this is a putative class action. The Court would be hard pressed to extend improperly the protections of New York's General Business Law nationwide on the basis of an argument of judicial estoppel.

[4] The Court applies New York law for purposes of this analysis. No party has briefed the question of choice of law with respect to this set of motions, and all parties briefs assume that New York substantive law governs. If "[t]he parties' briefs assume that New York substantive law governs the issues . . . such implied consent is, of course, sufficient to establish the applicable choice of law." *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) (quoting *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 n.4 (2d Cir. 2001)); *see also Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 323 (S.D.N.Y. 2014) (collecting cases). While the Court relies on New York law for purposes of evaluating this issue with respect to this motion, further evaluation of the choice of law question may be warranted with respect to the fraudulent inducement claims brought on behalf of the plaintiff individually, as well as on behalf of any putative class.

13

plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance.'" *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415-16 (2d Cir. 2006) (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir.1996)); *see also Gosmile, Inc. v. Levine*, 915 N.Y.S.2d 521, 524-25 (1st Dep't 2010); *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 490-91 (S.D.N.Y. 2017); *Perella Weinberg Partners LLC v. Kramer*, 58 N.Y.S.3d 384, 389-90 (1st Dep't 2017).

Mr. West argues that the plaintiff fails to make out a claim for fraudulent inducement because his Tweet was true when made. Mr. West tweeted that his album would "never, never, never" be available on Apple Music. Yet *The Life of Pablo* was released on Apple Music just a month and a half later. How, then, was the statement true? Mr. West argues that the *Life of Pablo* was "updated and remixed numerous times, with different vocals, lyrics, and arrangements," and that only those "'newly updated, remixed and remastered version[s]' of *The Life of Pablo* have been made available for purchase or streaming on platforms other than Tidal." West Memorandum of Law (ECF No. 100) ("West Mem."), at 11-12 (citing Second Am. Compl. ¶ 37 n.32). As a result, Mr. West claims that his Tweet was not false.

Mr. West's argument is tenuous, and certainly does not pass muster in the context of a motion to dismiss, when the Court is required to draw all inferences in favor of the non-moving party. After all, Mr. West tweeted that "*My album* will never never never be on Apple. And *it* will never be for sale" Second Am. Compl. ¶ 30 (emphasis added). He did not commit that a particular version, or mix, or master of his album would not be on Apple—his commitment was that the "album," "it," would not be. And the album was made available on Apple Music shortly after the Tweet. Regardless of whether or not Mr. West's argument will persuade a jury at a later stage in the case, the Court has little difficulty concluding that the complaint plausibly pleads that Mr. West's statement that his album would never never never be available on Apple Music or for sale was false.

The plaintiff's claim against Aspiro on the basis of Mr. West's Tweet is also supported by the facts pleaded in the complaint. The complaint alleges that Mr. West is an agent of the Aspiro and is therefore capable of making statements on its behalf. *Id.* Like Aspiro, the Court accepts the allegation that Mr. West was Aspiro's agent for purposes of this motion. Aspiro Reply Mem. of Law (ECF No. 106), at 6 n.2. Unlike Aspiro, the Court concludes that the complaint adequately pleads that Mr. West's statements were within the scope of his agency relationship. The complaint alleges that Mr. West received his ownership interest "in exchange for creating Tidal exclusive content to drive consumers to the subscription only streaming platform." Second Am. Compl. ¶ 23. Mr. West also committed his social media presence to promoting Tidal. *Id.* ¶ 24. The specific Tweet issued by Mr. West is described as a "reaffirmation" of Tidal's exclusivity statement. *Id.* ¶ 30. These allegations, together with the complaint's description of the business relationship between Mr. West and Tidal, are sufficient to nudge this claim across the line from conceivable to plausible.

The complaint adequately pleads scienter against both defendants with respect to Mr. West's Tweet. Although Rule 9(b) provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b), a plaintiff must "allege facts giving rise to 'a strong inference of fraudulent intent,'" *Novak*, 216 F.3d at 307 (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)). "The requisite 'strong inference' of fraud may be established either by (a) alleging facts to show that the defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

The facts alleged in the complaint provide strong circumstantial evidence of conscious misbehavior. The complaint describes in detail the dire financial condition of both Aspiro and Mr. West at the time of the release of his album. Second Am. Compl. ¶¶ 25, 29. It describes the tangible benefits of an increase in Tidal's subscriber base for both defendants. *See, e.g., id.* ¶¶ 23, 34,

15

41-44, 48. Most significantly, the complaint asserts that at the time that Mr. West tweeted that the album would "never never never" be available on Apple or for sale, both defendants knew that it soon would. *See, e.g., id.* ¶¶ 39-40. And a mere six weeks later, it was. *Id.* ¶¶ 37-38. These allegations constitute strong circumstantial evidence of conscious misbehavior.

### C. Aspiro's Tweet and Silence Alone Do Not Support Fraudulent Inducement Claim

The plaintiff's fraudulent inducement claim against Aspiro on the basis of the content of its February 14, 2015 Tweet alone is not pleaded adequately. At the outset, the plaintiff does not sufficiently plead reliance on that Tweet alone. According to the complaint, Mr. Baker-Rhett subscribed to Tidal "[i]mmediately after viewing Mr. West's February 15, 2016 announcement. . . ." *Id.* ¶ 50. Mr. Baker-Rhett's decision to sign up for Tidal was "a result of viewing Tidal's *and* Mr. West's announcements and representations that *The Life of Pablo* would only ever be available on Tidal." *Id.* ¶ 53 (emphasis added). All of the press stories touting the exclusivity of Tidal's platform focused on the content of Mr. West's Tweet. *Id.* ¶ 32. As pleaded, the facts support the contention that Mr. Baker-Rhett relied on Mr. West's statement, but not on Tidal's alone. The lack of a plausible allegation that the plaintiff relied on Aspiro's Tweet alone may be explained by the fact that Tidal's Tweet did not contain an express commitment that the album would be available exclusively on Tidal in the future.

After all, on its face, Tidal's Tweet was true. Tidal wrote the following: "We're bringing @KanyeWests's #TLOP to fans around the globe. It's streaming exclusively on TIDAL.com." *Id.* ¶ 29. A short English primer may be warranted: "It's" is a contraction of "it is." Tidal's statement describes the world as it was at the time it was issued. The words of Tidal's Tweet on their own cannot reasonably be construed to contain a commitment that the album "will be" or "would be" streaming exclusively on Tidal in the future. There is no allegation that Tidal's statement was false

16

when made—the album was streaming exclusively on Tidal on February 14, 2016, and would remain there exclusively for another six weeks.

Aspiro presented substantial arguments to support its position that Aspiro's Tweet cannot form the basis for a claim of misrepresentation because the facts asserted in it were true at the time. *See* Aspiro Mem. of Law (ECF No. 98), at 12-13; Aspiro Reply Mem. of Law (ECF No. 106), at 12; *see also Gosmile, Inc.*, 915 N.Y.S.2d at 524-25 ("To state a claim for fraudulent inducement, there must be a knowing misrepresentation of material present fact . . . ."); *Perella Weinberg Partners LLC*, 58 N.Y.S.3d at 389-90 ("To fulfill the element of misrepresentation of material fact, the party advancing the claim must allege a misrepresentation of present fact rather than of future intent."); *Gomez-Jimenez v. N.Y. Law Sch.*, 956 N.Y.S.2d 54, 60 (1st Dep't 2012). The plaintiff did not respond. Instead, the plaintiff pivoted, and argued that his fraudulent inducement claims against Aspiro are based not on an affirmative fraudulent misrepresentation by the company in the February 14 Tweet, but on its concealment from the market that the album would not be available forever exclusively on Tidal. Pl.'s Mem. of Law in Opp'n (ECF No. 105), at 26-27.

As the plaintiff points out, a claim of fraudulent inducement can be based on a material omission as well as a material misstatement. *See, e.g., Comolli v. Huntington Learning Centers, Inc.*, 117 F. Supp. 3d 343, 349 (S.D.N.Y. 2015) (describing first element of fraudulent inducement claim as "a material misrepresentation or omission of fact") (citing *Crigger v. Fahnestock & Co.,* 443 F.3d 230, 234 (2d Cir. 2006)). However, "[a] cause of action for fraudulent concealment requires . . . an allegation that the defendant had a duty to disclose material information and that it failed to do so." *Gomez-Jimenez*, 956 N.Y.S.2d at 59 (internal quotation marks and citation omitted). And here, the plaintiff has alleged no special relationship or fiduciary obligation requiring a duty of full and complete disclosure by Aspiro to its prospective customers. As a result, the plaintiff's claims against Aspiro are dismissed to the extent that they rely on a claim of fraudulent concealment of the limited

17

duration of the exclusivity period.

## IV.  LEAVE TO AMEND

In this circuit, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").  Accordingly, the Court grants the plaintiff leave to amend the complaint, solely with respect to those claims that were dismissed without prejudice, to correct the deficiencies identified in this opinion.  Any amended complaint must be filed no later than 30 days after the date of this order.

## V.  CONCLUSION

For the reasons stated above, the defendant's motions to dismiss are GRANTED in part and DENIED in part:

The plaintiff's claims arising under Sections 349 and 350 of New York's General Business Law are dismissed without prejudice.

The plaintiff's fraudulent inducement claim against Aspiro predicated on Aspiro's February 14 Tweet or alleged fraudulent concealment is dismissed without prejudice.  The plaintiff's claim against Aspiro may proceed to the extent that it is predicated upon the alleged misrepresentation in Mr. West's February 15 Tweet.

The Clerk of Court is directed to terminate the motions pending at ECF Nos. 96 and 99.

SO ORDERED.

Dated:  June 22, 2018  
New York, New York

                                              GREGORY H. WOODS  
                                              United States District Judge